*E-filed on* ___9/14/06___

United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JOSEPH DIGGS,<br><br>Plaintiff,<br><br>v.<br><br>CHERYL PLILER, Warden,<br>and THE ATTORNEY GENERAL OF THE<br>STATE OF CALIFORNIA<br><br>Defendant. | No. C-99-20659 RMW<br><br>ORDER DENYING PETITION FOR WRIT<br>OF HABEAS CORPUS<br><br>**[Re Docket Nos. 1, 16, 25, 27]** |

Petitioner Joseph Diggs seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  A jury convicted petitioner, Wanda Louise Fain, and Gregory Brown of conspiracy to commit first degree murder (count one) and attempted premeditated murder (count two).  Petitioner and Fain were also convicted of assault with a firearm (count three).  Petitioner was separately convicted of possession of a firearm by an ex-felon (count four).

Petitioner challenges his conviction, presenting five claims.  He argues that he was deprived of his Sixth and Fourteenth Amendment rights because there was insufficient evidence to convict him of the first three counts; that the trial court erred in admitting an incriminating statement of a non-testifying co-defendant; that any waiver of the previous issue deprived him of his right to effective assistance of counsel; that the trial court erred in denying his motion to re-open the case;

1  and that there was jury misconduct.  For the reasons set forth below, the court denies Diggs's

2  petition.

3  **I. BACKGROUND**

4  **A.** **The Events Preceding February 7, 1995**

5          Around 3 a.m. on January 6, 1995, police officers entered an apartment at 126 Blythdale in

6  San Francisco.  Reporter's Transcript on Appeal ("RT") 343.  The officers encountered Robin

7  Williams and Gregory Brown.  RT 343-44.  The officers found Brown with a firearm and discovered

8  crack cocaine in three different locations in the apartment.  *Id.*  Williams told police later that

9  morning that she had seen Brown in possession of both the gun and the cocaine.  RT 346-47.

10         Approximately ten days later, Wanda Fain handed Williams a note while Williams was

11 visiting a friend's house.  RT 516.  The note read, "Silence is the very best policy bitch . . . Chickens

12 get plucked everyday, so don't play," and was accompanied by "an explicit photograph of Ms.

13 Williams" that Brown had taken five years earlier when the two were dating.  RT 516-17.  After

14 handing her the note, Fain told Williams that Brown wanted to speak to her outside.  RT 517.

15 Williams waited in the house until Brown left and did not speak with him.  RT 518.

16         About a week and a half later, Williams did speak with Brown at his apartment.  RT 519-20,

17 546.  Brown told Williams that he did not want her to testify at his upcoming hearing, that she

18 should "stay out of sight," and that he would take care of her as long as she did not testify.  RT 519.

19 After her conversation with Brown, Williams no longer felt threatened and considered it safe to

20 continue her association with him.  RT 520.

21 **B.** **The Events of February 7, 1995**

22         On February 7, 1995, Williams went to 126 Blythdale to look for Brown, but found Fain and

23 petitioner instead.  RT 521-22.  During her thirty-minute visit, Williams smoked "a lot" of crack

24 cocaine, which Fain supplied.  RT 523-26.  Williams left and returned later that day at 7 p.m.  RT

25 526-27.  Brown, Fain, and petitioner were all present, and Brown was talking to Fain.  *Id.*  Williams

26 left for five minutes; when she returned Brown was gone.  *Id.*  At Fain's suggestion, Williams agreed

27 to accompany Fain to a "trick house" on Third Street, where they could be paid in exchange for sex.

28 RT 527-28.  Fain told Williams that petitioner would come along "for protection."  RT 531.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Williams, Fain, and petitioner left the apartment around 7:30 p.m. and took the No. 15 bus to

2   Third Street near the intersection of Third and Jerrold Streets. RT 529-33. Once on the street, Fain

3   walked next to Williams. RT 532-33. Williams testified that she and Fain were talking and

4   laughing while petitioner walked silently a few feet behind them. RT 533-34. Williams never

5   turned around or spoke with petitioner. *Id.*

6    Williams was apparently shot while walking down Jerrold. RT 536. While driving the No.

7   23 bus, Thomas Shelton found Williams unconscious and bleeding in the middle of Jerrold Street at

8   about 8:30 p.m. that night. RT 371-75. Later that night, while in the hospital, Williams informed

9   the police that she was with Fain and petitioner before the shooting. RT 710-11. Williams testified

10   that the last thing she remembered before waking up on the street was laughing with Fain. RT 536.

11   She also remembered a car pulling up behind her before she lost consciousness. RT 570. Williams

12   did not see who shot her, nor did she see anyone in possession of a gun that night. RT 579-580.

13    Police arrested Fain and petitioner, each "wearing some clothes but not much," at 126

14   Blythdale three or four hours after the shooting. RT 717-19. Fain consented to an initial search of

15   126 Blythdale. *Id.* The police later searched the apartment again with a warrant. RT 788. The

16   police did not find a gun at 126 Blythdale, nor did they locate the weapon used to shoot Williams

17   elsewhere. *Id.* Both Fain and petitioner waived their *Miranda* rights and cooperated with the police.

18   RT 723-24. Police conducted tests for gunpowder residue on Fain and petitioner, both of which

19   were negative. RT 962-71. They did not find any other evidence, such as bloody clothing, linking

20   either Fain or petitioner to the shooting. RT 802-06.

21   **C.    Fain's Statements**

22    Fain told police that she and Williams took a bus to Third and McKinnon to visit Fain's son.

23   758-59. Fain stated that she exited the bus and did not see Williams again. RT 723-24. After ten or

24   fifteen minutes, she saw petitioner at the bus stop. Resp. Ex. C[1] at 3-4. She and petitioner got on the

25   bus and returned to her apartment. *Id.* at 4-5. However, Fain later told police that she did not meet

26

27   _____

28   [1] In a November 11, 2001 letter, respondent admits that the second half of this exhibit (beginning at the middle of page 9) was not admitted at trial.

1  petitioner at the bus stop on Third, but rather that he had come with her on the bus initially.  *Id.* at 6-

2  7; RT 917-18.

3  **D.     Petitioner's Defense**

4        At trial, petitioner argued that he did not shoot Williams.  RT 323-24.  Petitioner explained to

5  police that he and Williams boarded and exited the bus together.  RT 725-26.  He then went to get

6  food at Kentucky Fried Chicken while Williams went to a nearby Taco Bell.  RT 726-27.

7  Afterwards, he went to get some beer, and he did not see Williams again.  RT 727.  Petitioner denied

8  that either he or Fain shot Williams.  *Id.*

9        Petitioner presented evidence that Williams' testimony was untrustworthy because of

10  memory loss due to her use of crack cocaine as well as the shooting, and because of her status as a

11  felon on probation.  RT 330, 333.  Petitioner presented two physicians who offered expert testimony

12  with respect to memory.  RT 926, 1109.  Dr. Eugene Schoenfeld, a psychiatrist specializing in the

13  effects of drugs, testified about the unreliability of memory among chronic users of crack cocaine

14  such as Williams.  RT 932-41.  Similarly, Dr. Richard Mendius, a neurologist, testified that because

15  Williams suffered a concussion from the shooting, her memory of the half hour before the shooting

16  was unreliable and subject to confabulation.[2]  RT 1118-19, 1123.

17        Petitioner also presented evidence regarding other suspects in the shooting.  RT 584-86.  He

18  argued that Williams, who had been in several physical fights, had a number of enemies who might

19  have sought to harm her.  *Id.*  Several witnesses at the scene of the shooting described a suspect who

20  did not resemble the petitioner.  RT 359-61, 1160-62.

21  **E.     Inconsistencies between Petitioner's and Fain's Testimony**

22        Prior to trial, petitioner's counsel moved to sever his case from Fain's since there were

23  inconsistencies between their statements, and if she were a co-defendant he would be unable to

24  cross-examine her.  Clerk's Transcript on Appeal ("CT") 206; RT 34-37.  Instead of severing the

25  cases, the trial court ordered that the statements be redacted and that all references to petitioner in

26  Fain's statements be deleted.  RT 36.  However, during the cross, redirect, and re-cross examinations

27  _____

28  [2]  THE AMERICAN HERITAGE STEDMAN'S MEDICAL DICTIONARY (Houghton Mifflin Co., 3d ed. 2002), defines "confabulation" as: "The unconscious filling of gaps in one's memory by fabrications that one accepts as facts."

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW

4

United States District Court
For the Northern District of California

of Officer Levin, both the prosecution and Fain's counsel mentioned Fain's statements about the petitioner.  RT 807-19.  Neither petitioner's counsel nor Fain's counsel objected during cross-examination of Levin.  *Id.*

Petitioner's counsel did make a hearsay objection when the prosecutor asked Levin what Fain had said about petitioner.  RT 807.  The court overruled the objection.  *Id.*  Petitioner's counsel posed a "continuing objection" when the prosecution asked questions designed to elicit Fain's statements about petitioner, which the court also overruled.  RT 808.  During re-cross-examination, counsel for Fain questioned Levin on the same subject.  RT 813-14.  When Fain's counsel sought to introduce a transcript containing some of her statements about petitioner, the court said it needed to "review the record in this case" to determine if petitioner had waived his right under *Bruton v. United States*, 391 U.S. 123 (1968), to exclude Fain's statement from trial.  RT 816-18.  The court ruled that, based on the cross-examination of Levin by petitioner's counsel, the *Bruton* issue had been waived.  RT 906-10.  Fain's counsel continued to question Levin about Fain's statements regarding petitioner.  RT 917.  The court permitted the introduction of a tape recording and a transcript of a portion of the tape.  RT 917-18.

When petitioner raised the issue in the California Court of Appeal, that court found that counsel for petitioner "failed to lodge a specific *Bruton* objection when the evidence allegedly violative of *Bruton* was received."  *People v. Brown,* No. A072126, slip op. (Cal. Ct. App. Jan. 28, 1998) at 17.  Relying on California's contemporaneous objection rule, which requires a timely objection to preserve issues for appeal, Court of Appeal found that the *Bruton* issue had been waived.  *Id.*; *see* CAL. EVID. CODE § 353.

**F.    <u>Williams's Testimony</u>**

Fain's counsel cross-examined Williams regarding her prior conviction for residential burglary.  RT 573.  Williams testified that three men had taken part in the burglary and that she had supplied their names to the officer investigating the burglary and to Levin.  RT 575.  When the prosecutor questioned her on redirect, Williams stated that she had provided the police with a confession on the day of the burglary.  RT 597-99.

**United States District Court**
For the Northern District of California

1    The prosecution later disclosed an incident report which indicated that Williams offered a

2    confession to the police only after being confronted with evidence against her.  RT 1419-20.

3    However, it did not make the disclosure until after the parties had rested.  *Id.*  After receiving the

4    report, petitioner moved to re-open his case since the jurors had been given "the impression that

5    [Williams] was purer in that incident than was, in fact, true."  *Id.*  The court denied petitioner's

6    motion and did not re-open the proceedings.  RT 1421.

7    Petitioner challenged the court's denial of his motion in the Court of Appeal as an abuse of

8    discretion.  *Brown* at 18-19.  The Court of Appeal found that the motion was untimely because

9    petitioner's motion came after all the parties had rested and the jury had been fully instructed.  *Id.*

10   Although the petitioner did not fail to discover the report through any fault of his own, the additional

11   evidence it provided was, in the words of the Court of Appeal, "not so significant that it warranted

12   stopping deliberations."  *Id.* at 20.

13   **G.    Jury Deliberations and Verdict**

14   After three days of deliberation, the jury convicted Fain, Brown, and petitioner on all counts.

15   CT 407-10.  The jury was also asked to make findings about several enhancement allegations related

16   to the attempted murder.  CT 425-26.  As to petitioner, the jury failed to find four of the

17   enhancement allegations.  *Id.*  Specifically, the jury did not find that Fain and petitioner shot

18   Williams in the back of the head, or again when she was on the ground*,* or that they had each

19   personally inflicted great bodily injury on Williams*.  Id.*  Nor did the jury accept that petitioner had

20   personally used a firearm.  *Id.* at 426.

21   Subsequently, counsel for Brown and petitioner undertook an investigation into possible jury

22   misconduct.  CT 441.  Statements from jurors revealed that the jury had consulted a MUNI bus

23   schedule, which had not been presented as evidence at trial, and a statement from a juror during

24   deliberations regarding the effect of crack cocaine with respect to memory loss.  CT 451-52, 533-36,

25   575-79, 618-19.

26   Juror Elwood stated that the jury made a time line from January 6 to February 10 and another

27   for the evening of the incident.  CT 451-52.  He further stated that the jury consulted bus schedules,

28   which "provided us information about the intervals between buses and the frequency with which

United States District Court

For the Northern District of California

buses came; this information along with court testimony and statements helped [the jury] to fill in their time line from 7:30 p.m. until 8:35 p.m. on the night of the shooting." *Id.* Elwood also stated that a juror "made reference to the fact that if you do crack cocaine, it does not mean you lose your memory" during deliberations. Petitioner's Memo. ("Pet. Mem.") at 34, 38-39 (citing CT 451-52).

Juror Pemberton stated that "[d]uring deliberations, a juror had a bus schedule with" him or her. CT 453-54. The jurors "looked at the schedule and [they] talked about how long the bus ride took, when [Fain, Williams, and petitioner] got on the bus, and how long it took to get where they were going." *Id.* She explained that it was open "just long enough to find the bus line . . . certainly less than five minutes." CT 579-80.

Jurors Bowman, Hayes, and Owens claimed to see a bus schedule in the jury room, although briefly. Bowman said he "vaguely recall[ed] seeing a bus schedule during jury deliberations." CT 574. Hayes also recalled seeing a bus schedule in the room. CT 575-76. However, Hayes claimed that he never held the schedule and no information was copied from it or written on the blackboard. *Id.* Owens "recall[ed] that a grey haired older male juror had a bus schedule in the jury room." CT 577-78. Jurors Maher, McQueen, and Beurmann declared they had not seen a bus schedule at any point during the deliberations. CT 571-73.

Petitioner and his co-defendants alleged jury misconduct and moved for a new trial. *Brown* at 20. The trial court found no likelihood that the jury was impermissibly prejudiced and denied the motion. RT 1502-03.

## H.    Post-Conviction Procedural History

After sentencing, petitioner filed a notice of appeal on October 25, 1995. CT 657. On January 28, 1998 the California Court of Appeal reversed the conviction on count four and affirmed the remaining charges. *Brown* at 29. Petitioner filed a petition for review with the California Supreme Court, which the court denied without comment on April 29, 1998. Resp. Exs. G, H.

On January 22, 1999 petitioner filed his application for writ of habeas corpus in the California Supreme Court, arguing that admission of Fain's statements again him was error and that ineffective assistance of counsel had deprived him of his rights under the Sixth and Fourteenth

1   Amendments.  Resp. Ex. I.  The court denied the petition without comment on May 26, 1999.  Pet.

2   Mem. at 3; Ans. Memo. at 2.

3        Petitioner filed the present petition on July 16, 1999.  Docket no. 1.  This court issued an

4   order to show cause on August 23, 2000.  Docket no. 5.  The respondent filed an answer and

5   opposition to the petition on January 19, 2001.  Docket nos. 15, 16.  Petitioner filed a traverse on

6   April 20, 2001.  Docket no. 24.

## II.  DISCUSSION

**A.**     **Standard of Review**

     This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act
of 1996 (AEDPA), as incorporated in the federal habeas statute (28 U.S.C. § 2241 *et seq*).[3]  "To
obtain federal habeas relief, Petitioner must satisfy either [28 U.S.C.] § 2254(d)(1) or § 2254(d)(2)."
*Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. 362,
403 (2000)).  "State prisoners are entitled to relief under 28 U.S.C. § 2254 only if their detention
violates the Constitution or a federal statute or treaty."  *Walters v. Maass*, 45 F.3d 1355, 1357 (9th
Cir. 1995) (citing 28 U.S.C. § 2241(c); *Rose v. Hodges*, 423 U.S. 19, 21 (1975) (*per curiam*)).

     Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable
> > application of, clearly established federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination
> > of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[4]  Explaining § 2254(d), the Ninth Circuit has stated:

---

[3]  AEDPA became law on April 24, 1996.  *Jeffries v. Wood*, 114 F.3d 1484, 1493 (9th Cir. 1997).
Federal habeas cases filed after AEDPA's effective date are governed by AEDPA. *Lindh v. Murphy*,
521 U.S. 320, 322-23, 336 (1997).  Petitioner filed this instant petition on July 16, 1999, after
AEDPA went into effect.

[4]  Petitioner brings all his claims under § 2254(d)(1).  Pet. at 4 ("the adjudication of each claim
resulted in a decision that was contrary to, or involved in an unreasonable application of, clearly
established Federal law, as determined by the Supreme Court of the United States, as defined in 28
U.S.C. § 2254(d)(1)."

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1
2
3
4

> A state court decision is contrary to clearly established federal law if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from the Supreme Court precedent.  A state court decision involves an unreasonable application of clearly established federal law if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

5
6
7
8

*Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) (citing *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)).  "[T]he only definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court."  *Van Tran*, 212 F.3d at 1154 (citing *Williams*, 529 U.S. at 412).

9
10
11
12
13
14
15
16
17
18

     When reviewing a state court decision under AEDPA, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  *Williams*, 529 U.S. at 411.[5]  "[A] decision involves 'an unreasonable application of' clearly established federal law as determined by the Supreme Court only if its application of that law is 'objectively unreasonable.'"  *Fowler v. Sacramento County Sheriff's Dept.*, 421 F.3d 1027, 1035 (9th Cir. 2005) (citing *Williams*, 529 U.S. at 409).  Thus, a federal court may not issue a writ unless it finds the state court's application of federal law to be objectively erroneous.  *Williams*, 529 U.S. at 410.

19
20
21
22

---

[5]   Both petitioner's and respondent's moving papers cite to the Ninth Circuit's holding in *Van Tran*, which interpreted § 2254(d)(1)'s "unreasonable application provision to mean "clearly erroneous."  212 F.3d at 1153-1154.  According to *Van Tran*, a federal court on habeas review

23
24
25
26

> must reverse a state court's decision as involving an 'unreasonable application' of clearly established federal law when our independent review of the legal question does not merely allow us ultimately to conclude that the petitioner has the better of two reasonable legal arguments, but rather leaves us with a 'firm conviction' that one answer, the one rejected by the court, was correct and the other, the application that the court adopted, was erroneous.

27
28

*Id.*  Subsequent to the filing of the parties moving papers here, the Supreme Court clarified the standard for a federal court on habeas review, and explicitly overruled the Ninth Circuit's "clearly erroneous" standard articulated in *Van Tran* as insufficiently deferential.  *See Andrade*, 538 U.S. at 76 ("It is not enough that a federal habeas court, in its 'independent review of the legal question,' is left with a 'firm conviction' that the state court was 'erroneous.'").

The federal court reviewing a habeas claim looks to the "last reasoned decision" in the state court system.[6] *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). In determining whether the state court's decision is an objectively unreasonable application of clearly established Supreme Court precedent, the federal court need not concern itself with the precise reasoning offered by the state court for its decision. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). "A state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [Supreme Court] opinions." *Id.* "[A] state court need not even be aware of [Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.* "[I]t is the state court's decision, not its reasoning, that is judged under the 'unreasonable application' standard. *Williams v. Warden for the Nev. Women's Corr. Facility*, 422 F.3d 1006, 1010 (9th Cir. 2005).

**B.    Petitioner's Insufficiency of Evidence Claim**

Petitioner's first claim is that the state's evidence was insufficient to sustain his conviction as a matter of constitutional law. Petitioner correctly ascertains that his petition ultimately succeeds or fails on an evaluation of the sufficiency of the state's evidence against him as presented at trial. Petitioner contends that the state's evidence was insufficient to sustain his convictions, or, alternatively, if sufficient, the evidence was so "remarkably thin" that if this court should find error at trial, it must inevitably conclude that the trial error prejudiced petitioner. Pet. Mem. at 2; Trav. Mem. at 15. However, under the AEDPA standard of review, this court cannot say that the evidence at trial was not sufficient to sustain his convictions.

**1.    Standard for Insufficiency of Evidence Claims**

Petitioner contends that he "was deprived of his Fourteenth Amendment right to due process of law because the evidence against him was constitutionally insufficient." Pet. Mem. at 3. "As a matter of federal constitutional law, 'the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with

---

[6] While commonly the "last reasoned decision" in the state court system will be an appellate court opinion, *see, e.g.*, *Yee v. Duncan*, 441 F.3d 851, 856 (9th Cir. 2006), the "last reasoned decision" with respect to an issue on review may have been in the trial court, *see, e.g.*, *Fowler*, 421 F.3d at 1038, or a combination of both the trial court and appellate court, *see, e.g.*, *Taylor v. Maddox*, 366 F.3d 992, 999 n.5 (9th Cir. 2004).

which he is charged.'"  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).  Petitioner and respondent agree that the clearly-established standard for an insufficiency of evidence claim on habeas review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).  The California Court of Appeal acknowledged *Jackson v. Virginia* as the governing constitutional standard for insufficiency of evidence claims.[7]  *Brown* at 6.

Under *Jackson*, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  443 U.S. at 326.  "The reviewing court must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."  *Walters*, 45 F.3d at 1358.  Circumstantial evidence alone is sufficient to establish facts conclusively at trial.  *United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990) ("[C]ircumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's fact-finding function is concerned.").  Although a court "must draw all reasonable inferences in favor of the prosecution, a

---

[7]  Respondent points out that "*Jackson* is followed in California."  Ans. Mem. at 8-9 (citing *People v. Johnson*, 26 Cal. 3d 557, 575-78 (1980)).  California state law establishes a "substantial evidence" test for sufficiency of evidence claims.  *People v. Blakeslee*, 2 Cal. App. 3d 831, 836-37 (1999).  The California Court of Appeal appears to have applied both the *Jackson* standard and California's "substantial evidence" test in evaluating petitioner's sufficiency of evidence claim.  *See Brown* at 6-12 ("[T]he role of the appellate court is to review the entire record to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible and of solid value—from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.").  It is not necessary for this court here to address any distinctions between California's "substantial evidence" test and the *Jackson* standard, as only *Jackson* is relevant here.

Petitioner appears to rely on California's "substantial evidence" test in his argument.  *See*, *e.g.*, Pet. Mem. at 14 ("[T]here was no substantial evidence connecting Mr. Diggs to the offense.").  The court will not conflate California's sufficiency of evidence test with the one it must follow here, the *Jackson* standard.

United States District Court

For the Northern District of California

'reasonable' inference is one that is supported by a chain of logic, rather than . . . mere speculation dressed up in the guise of evidence." *Juan H.*, 408 F.3d at 1277.

Post-AEDPA, federal courts "apply the standards of *Jackson* with an additional layer of deference," asking "whether the state court in substance made an objectively unreasonable application of the *Winship* and *Jackson* standards for sufficiency of evidence." *Juan H.,* 408 F.3d at 1274-75. In evaluating a sufficiency of evidence claim, this court must also consider "the elements of the criminal offense as set forth by state law." *Id.* at 1275.

### 2.    Conspiracy Conviction

Under California law, "[t]he necessary elements of a criminal conspiracy are: (1) an agreement between two or more persons; (2) with the specific intent to agree to commit a public offense; (3) with the further specific intent to commit that offense; and (4) an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement or conspiracy." *People v. Liu*, 46 Cal. App. 4th 1119, 1128 (1996). Direct evidence is not required to prove the crime of conspiracy; circumstantial evidence is sufficient. *People v. Superior Court (Quinteros)*, 13 Cal. App. 4th 12, 20 (1993). The "conduct and relationship of the parties" may be proven by circumstantial evidence. *People v. Manson*, 61 Cal. App. 3d 102, 126 (1976).

### a.    The California Court of Appeal's Opinion

On Diggs's direct appeal, the Court of Appeal pointed out the jury's special findings on fourteen alleged acts (ten of which the jury determined to be true) in furtherance of the conspiracy, including those suggesting motive on the part of Brown and Fain.[8] *Brown* at 7-8. The court also noted the jury's special findings that between January 6, 1995 and February 7, 1995, Brown encouraged Fain and Diggs to murder Williams, and that on February 7, 1995, "(1) Fain provided crack cocaine to Williams; (2) Fain encouraged Williams to go to Jerrold Street with Fain and Diggs; (3) Fain and Diggs took Williams to Jerrold Street with the intention of murdering Williams; (4) Fain and Diggs walked on Jerrold Street approaching Quint Street with Williams." *Id.* The court

---

[8] *E.g.*, the threatening note Fain and Brown delivered to Williams approximately ten days after Brown's arrest on January 6, 1995. *Brown* at 7-8.

then pointed out that Diggs lived with Brown and Fain, and was intimately involved with Fain.  *Id.*
Further,

> Diggs was present in the apartment when Fain plied Williams with crack cocaine, and
> urged her to accompany them to Jerrold Street to turn a trick. The jury could
> reasonably infer from his relationship with Fain, that Diggs accompanied Fain and
> Williams on the bus with complete knowledge of what was about to occur. Diggs'
> statement to the police about the events of February 7 was completely inconsistent
> with that of Williams as well as that of Fain. From that inconsistency, the jury could
> infer that Diggs was lying to the police and hence was attempting to cover up his
> participation in the conspiracy and target offense.

*Id.* at 8-9.  Lastly, "the evidence shows that he was walking directly behind Williams at about the
time she was shot."  *Id.* at 9.  Based on the foregoing, the Court of Appeals found "substantial
evidence to support the jury verdict finding Diggs guilty of conspiracy to commit the premeditated
murder of Williams."  *Id.*

> **b.     Petitioner's contentions**

> **i.        Whether Petitioner Was with Williams When She Was Shot**

Petitioner's insufficiency of evidence claim hinges on the assumption that no reasonable jury
could conclude anything more than that petitioner was walking with Williams somewhere in the
general vicinity of where Williams was shot, "sometime before the shooting."  Pet. Mem. at 16.  If
there was no evidence in the record upon which a reasonable jury could find that Fain and petitioner
led Williams to the location of her shooting—and were with her at the moment she was shot—the
remaining evidence would perhaps be too tenuous to establish the elements of conspiracy to commit
attempted murder.

However, there was evidence in the record upon which a reasonable jury could find that Fain
and petitioner led Williams to the location of her shooting and were with her at the moment she was
shot.  There is uncontroverted evidence which suggests that Fain, with whom petitioner was in an
intimate relationship, plied Williams with free crack cocaine on the day of the shooting.[9]  A

---

[9]  The possible significance of Fain's offering free cocaine to Williams on this day was presumably
not lost on the jury, with Williams testifying:

> Q.   Now, when you first went to 126 Blythdale on February 7th, what did you do
>      there?
> A.   Me and Wanda was smoking some crack.
> Q.   Where did the crack come from?
> A.   I don't know.  She would just leave and come back with it.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  reasonable jury would take note of the fact that the shooting and its attendant events took place three

2  days before Brown's preliminary hearing on his January 6, 1995 arrest on weapons and drug

3  possession charges—the arrest which precipitated the threatening note from Fain and Brown to

4  Williams.

5      The jury would similarly have noted that Fain suggested to Williams that they, accompanied

6  by petitioner "for protection," go to a location "way down Third" Street to perform acts of

7  prostitution in order to obtain funds to purchase more cocaine.  RT 527-31.  A reasonable jury could

8  have credited Williams' testimony that placed her at the location where she was subsequently found

9  shot (on Jerrold Street, approaching the railroad bridge at Quint Street), with Fain walking beside

10  her, and petitioner walking silently behind her.  RT 533-35.

11      In addition, a reasonable jury could credit Williams' testimony that the location where she

12  was shot on Jerrold Street was desolate, and that there were no pedestrians and no open businesses.

13  RT 534-35, 373-74.  This testimony was corroborated in detail by the testimony of the bus driver.

14  *Id.*  A reasonable jury might note there was no evidence of any residence or rooming house at the

15  location where Williams was shot, suggesting that the "trick house" Fain was purporting to lead

16  Williams to was a pretext.  Further, a reasonable jury could conclude that when Williams testified

17  that she was walking with Fain and petitioner when "the lights went out," RT 569, the "lights went

18  out" at the precise moment the bullet struck her in the back of her head.

19

20

21  ─────────────

22      Q.   And she gave it to you?  Did you have to pay for it?
    A.   No.
    Q.   How much crack do you think you smoked on that date?

23      A.   A lot.

24  RT 523.  Williams prior testimony suggests that other than a single incident where Brown gave her a
piece of crack cocaine, her crack cocaine use during the preceding several months may have been

25  only when she paid for it:

26      Q.   During that time period you were at times smoking cocaine; is that right?
    A   Yes.

27      Q.   Who did you get the cocaine from?
    A.   Anybody that sold it.

28  RT 520-21.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW
14

1    The jury, in order to reach its verdict, had to have made an implied finding of fact[10] that Fain

2 and petitioner were walking with Williams at the location and moment she was shot.  The jury's

3 special findings suggest that the jury did reach such an implied finding of fact.  The "overt acts"

4 found by the jury included that "Fain encouraged Williams to go to Jerrold Street with Fain and

5 Diggs; [] Fain and Diggs took Williams to Jerrold Street with the intention of murdering Williams; []

6 Fain and Diggs walked on Jerrold Street approaching Quint Street with Williams."  *Brown* at 8.

7    This court finds that not only a reasonable, but the most reasonable, inference from the

8 evidence presented at trial is that the jury accepted the prosecutor's argument that petitioner and Fain

9 led Williams, by pretext, "to a quiet street to be killed," with "no other reason for her to be on

10 Jerrold."  *See* RT 1268.  The Court of Appeal appears to have taken this view:  "The evidence shows

11 that [Diggs] was walking directly behind Williams at about the time she was shot" in the back of the

12 head.  *Brown* at 9.

13    It was not objectively unreasonable for the California Court of Appeal to find that there was

14 sufficient evidence for a reasonable jury to find, beyond a reasonable doubt, each element of the

15 crime of conspiracy as it is defined in California.  The evidence would allow a reasonable jury to

16 conclude that petitioner "accompanied Fain and Williams on the bus with complete agreement of

17 what was about to occur."  *See Brown* at 8.  Doing so would inferentially establish that petitioner

18 agreed to participate in the conspiracy.  The specific goal of the conspiracy was murdering Williams,

19 and led to "the commission of an overt act for the purposes of accomplishing the objective of the

20 agreement."  *See Liu*, 46 Cal. App. 4th at 1128.  The Court of Appeal's affirmation of the verdict on

21 this point is not an unreasonable application of *Jackson*.

22

23

24 [10]  Such an implied finding of fact by the jury is due the deference all state court factual findings
must be accorded by a federal court on habeas review.  *See Williams*, 422 F.3d at 1010 ("Under
25 AEDPA, this court owes a state court's findings of fact great deference.  28 U.S.C. § 2254(e)(1).  We
must presume the correctness of the state court's factual findings absent clear and convincing
26 evidence to the contrary.").  This court recognizes that such a finding by the jury is not the only
plausible interpretation of the facts and evidence presented at trial, though its own review of the
27 trial record leads it to believe that such is the most reasonable interpretation of the evidence.
However, this court on habeas review is not permitted to issue the writ even if it would have found
28 differently than the jury had it served as finder-of-fact.  *Payne v. Borg*, 982 F.2d 335, 339 (9th Cir.
1992).

United States District Court
For the Northern District of California

1

2

### ii.    Whether Evidence Considered Was Admissible

Petitioner next contends that the appellate court "only found sufficient evidence by considering evidence that was not admitted against Diggs," maintaining that "Fain's statement to the police . . . was not admissible against Diggs."  Pet. Mem. at 16.  The Court of Appeal held that "Diggs' statement to the police about the events of February 7 was completely inconsistent with that of Williams as well as that of Fain.  From that inconsistency, the jury could infer that Diggs was lying to the police and hence was attempting to cover up his participation in the conspiracy and target offense."  *Brown* at 8-9.

However, a reasonable jury could have credited Williams's story placing petitioner with Williams at the exact location and moment she was shot without referring to petitioner's statement made to the police in the early morning hours after the shooting.  Further, based on the inconsistencies between petitioner's story and Williams's, a reasonable jury could have declined to credit petitioner's story, and could have believed the inconsistencies between his statement and Williams's to have impeached his credibility.

There is no support for petitioner's argument that the inconsistencies between Fain's and petitioner's statements to the police were improperly considered by the jury during deliberations.  While the inconsistencies may have been considered by the jury in assessing petitioner's credibility (and there is evidence in the record that the jury did so consider those statements[11]), there is nothing in Fain's statement (nor in petitioner's for that matter) that directly inculpates petitioner.  The Supreme Court cases petitioner cites in support of his contention do not address the factual or legal issue of whether a jury can consider inconsistencies between a co-defendant's statement and defendant's in assessing defendant's credibility.  Rather, they are concerned with the substantially different factual and legal context of the admissibility of a co-defendant's confession of guilt where

---

[11]  "We discussed the inconsistencies between defendant Wanda Fain's statement and defendant Joseph Diggs' statement.  We discussed how these inconsistencies demonstrated that at least one of them was lying."  CT 534 (declaration of juror Elwood).  "One of the most bothersome things for me was that Wanda & Josephs' stories didn't mesh, particularly regarding getting off the bus at the same place.  I expressed during deliberations that that was significant to me.  I also remember somebody else said something like 'they [Wanda and Joseph] could have at least gotten their stories straight.'"  CT 536-37 (declaration of juror Pemberton).

1    the co-defendant has explicitly inculpated the defendant.  *See Lilly v. Virginia*, 527 U.S. 116, 120-21

2    (1999); *Lee v. Illinois*, 476 U.S. 530, 532 (1986).

3         Petitioner also contends that the trial court's instruction to the jury did not make sufficiently

4    clear that the jury should not have considered the inconsistencies between defendant and co-

5    defendant's statements in evaluating defendant's credibility.  While it is true that the instruction

6    given[12] can be read to suggest this, it can also be plausibly read as merely precluding the jury from

7    considering statements co-defendant made about defendant's actions as proof of the truth of those

8    actions.  Petitioner does not offer any authority in support of his interpretation of the instruction, nor

9    has this court been able to find any.  As discussed above, a reasonable jury could have found

10   sufficient evidence to convict petitioner for conspiracy without reference to the inconsistencies

11   between Fain's and petitioner's statements.  The Court of Appeal's decision on this point was

12   therefore not an unreasonable application of any Supreme Court precedent.

13                        **iii.      Lack of Physical Evidence**

14        Petitioner points out that "there was no forensic, physical or eyewitness evidence linking

15   Diggs to the shooting.  No gun was found, and no gunshot residue was found."  Pet. Mem. at 17.

16   Although "the lack of gunshot residue hours after Williams was shot was evidence consistent with a

17   scenario in which neither Diggs nor Fain handled or fired a gun, nor were near a gun that was fired,"

18   *see id*. at 9, the absence of physical evidence did not exculpate petitioner on the facts of this case.[13]

19   _____

20   [12]  California Jury Instructions—Criminal 2.08 (7th ed.) reads in its entirety:

21        STATEMENT LIMITED TO ONE DEFENDANT ONLY
          Evidence has been received of a statement made by a defendant after [his] [her]
22        arrest/
          1.08    [At the time the evidence of this statement was received you were in-
23                structed that it could not be considered by you against other defendant[s].]
          1.09    Do not consider the evidence of this statement against the other defendant[s].
24

25   [13]  Of the various items of possible physical evidence discussed at trial, the gunshot residue tests
     on Fain's and petitioner's hands, upon their arrests, some five and a hours after the shooting, would
26   have been perhaps the most probative if the samples had been taken close enough to the time of
     the shooting that residue would have been expected to be found.  However, as Inspector Levin
27   testified at trial, "I have since been told that actually five hours is one of the outside windows, and
     we were right about at that time."  RT 774.  The defense's ballistics expert, Mr. Gialamas,
28   similarly testified that the lack of gunshot residue supported either a conclusion that "the test
     subject did fire or handle a firearm, but because of variables [including] delay in sampling . . . no
     particles were detected [or] . . . that the individual did not have contact with the firearm."  RT 963.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW
                                        17

**United States District Court**
For the Northern District of California

1    As noted above, there was sufficient evidence for a reasonable jury to find the elements of

2    conspiracy beyond a reasonable doubt.  While that evidence was primarily circumstantial,

3    circumstantial evidence alone is sufficient to establish facts conclusively at trial.  *Stauffer*, 922 F.2d

4    at 514.  That the Court of Appeal upheld petitioner's conspiracy conviction, albeit one solely based

5    on circumstantial evidence, was not an unreasonably application of *Jackson*.

6                    **iv.    Reliability of Williams's Testimony**

7    Petitioner also contends that "Williams' memory was so clouded by cocaine abuse and

8    trauma that her recollection of the shooting itself and for some unknown time before the shooting

9    had admittedly been 'erased.'" Trav. Mem. at 5.  Petitioner bases his contentions on the testimony of

10   two defense witnesses, Dr. Schoenfeld and Dr. Mendius.  Petitioner maintains that

11          unrebutted defense expert testimony made clear that . . . Williams' cocaine abuse and
            heavy cocaine intoxication at the time of the incident and . . . her severe head trauma
12          and admitted loss of memory. . . subjected Williams to confabulation where she
            would confuse and mix-up events that happened at different times or that never
13          happened at all.

14   Trav. Mem. at 9.  While neither Dr. Schoenfeld nor Dr. Mendius had published peer-reviewed

15   papers in the area of memory research, nor had either examined Williams, they opined that extensive

16   cocaine use and physical trauma, respectively, could render someone's recollection of recent events

17   inaccurate.  RT 927-44, 1109-45.

18   Crediting defense witnesses' testimony would have allowed the jury to reasonably conclude

19   that Williams' testimony as to her walking with Fain and petitioner at the location where (and

20   inferentially, at the moment when) she was shot was unreliable.  But the jury was not compelled to

21   reach such a conclusion, and petitioner does not offer any authority which would suggest it was.

22   The jury's verdict suggests it credited Williams' testimony and that it was not persuaded by defense

23   expert testimony offered to cast doubt on her reliability.[14]  The jury also reasonably rejected the

24   _____

25   Hence, the gunshot residue tests, like the lack of a weapon found, while providing the prosecution
     no help in proving its case, were simply inconclusive, rather than exculpatory of petitioner.

26   [14]  The court notes that Williams's testimony of the events of February 7, 1995, up to and including
     her walking with Fain and petitioner at the location where she was subsequently found after being
27   shot, was detailed and internally consistent.  Williams recalled specifics of her bus ride with Fain
     and petitioner.  RT 563-565.  Her recollection of the location where she was walking was the same
28   as where she was found shot, and was consistent with the account given by the bus driver who found
     her.  RT 532-536, 372-378, 379-380.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW

United States District Court

For the Northern District of California

defense's assertion that Williams's statement made at the preliminary hearing that "[a] lot of my memory got erased from that night," RT 551, inevitably meant that none of her testimony recalling events shortly before the shooting was to be credited. Trav. Mem. at 5.

Williams' testimony at trial regarding the day she was shot demonstrates a marked contrast between her specific and detailed recollections up to the point where she presumably lost consciousness, and her memory of events after she was shot. Her testimony indicates that immediately after she was shot, much of her memory of that evening was hazy and uncertain. *See* RT 539. However, the Levin testified that at the hospital Williams stated "that Wanda had done this to her." RT 709. It was reasonable for the jury to infer from this that Fain's involvement meant Diggs was involved, too.

The jury necessarily found Williams's testimony credible. Under *Juan H.*, it is enough for this court to find that the Court of Appeal's decision that a reasonable jury could have found her testimony credible was not objectively unreasonable. The court does so find.

### v.      Identity of the Shooter

While this court finds petitioner's theory that Williams' testimony as to the events immediately prior to her shooting was unreliable to be plausible (though ultimately unpersuasive), it finds petitioner's contention that "substantial evidence [suggested] that Williams was shot by others unrelated to Diggs, Fain and Brown," Trav. Mem. at 10, to be entirely speculative. Petitioner's theories at trial failed not only because they lacked concrete evidentiary support, but also because they failed to explain how one of Williams' other "putative" enemies, without acting in collusion with petitioner and Fain, would have known Williams would be on Jerrold Street approaching Quint at the moment she was shot.[15]

---

[15] As the prosecutor put it in his closing argument:

> To go along with the defense theory that it was some other person did it, they've named all these other possible people that maybe shot Robin. All right, let's run with that a second.
>
> Diggs and Fain get on the bus with her, but when they get off the bus she goes somewhere else. Where is she going? Okay, fine. She's walking down Jerrold Street by herself in the middle of nowhere, apparently not going anywhere in particular. And then because this is the only way it will work, then somebody who dislikes her from the other neighborhood [several miles away] sees her there and decides then and there to kill her.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW

United States District Court

For the Northern District of California

1   The defense's theory that someone else ("Suspect 1," as he was referred to at trial) was the

2   real shooter is similarly flawed.  Williams and bus driver Thomas Shelton both testified that there

3   were no pedestrians or open businesses on Jerrold Street prior to the shooting and upon Shelton's

4   discovery of Williams.  Shelton testified that it wasn't until seven or eight minutes after he

5   discovered Williams, and after emergency personnel gathered, that cars came by and stopped.  Some

6   of those later onlookers observed "Suspect 1"—another onlooker who came on the scene after the

7   shooting, and after the emergency personnel had arrived—acting in a manner the witness believed to

8   be suspicious.  The jury was evidently not persuaded that Suspect 1 was likely to have been the

9   shooter.[16]  Lastly, Williams's confused recollection whether the car lights appeared behind her before

10  or after the shooting[17] does not indicate the jury's rejection of petitioner's "Suspect 1" theory was an

11  "unreasonable determination of the facts."  *See* § 2254(d)(2).

12  Petitioner is not entitled to habeas relief from his conspiracy conviction.

13  **3.    Attempted Murder and Assault**

14  The evidence supporting petitioner's conviction for attempted murder is mostly the same as

15  that for conspiracy to commit murder.  The California Court of Appeal briefly addressed the

16  sufficiency of evidence question for attempted murder:

17  _____

18  . . .

19  [H]ow does this work?  How do . . . we get those people on Jerrold Street to shoot her in the head?

20  RT 1347, 1349.

21  [16] Inspector Levin testified regarding the witnesses who observed Suspect 1 that "on the way there
    I was told there were witnesses on the scene, but when I got there . . . I briefly spoke with them
22  and I felt they weren't really witnesses because they came upon the scene after the bus was already
    there."  RT 738.  The best description of Suspect 1 in the record appears to be the following:
23

24  It was a black male—I really can't tell because he was scrunched over.  You could
    tell he was a big person, and it was from the side view so I didn't really get to see
25  his face, but you could tell he had a short afro.  You couldn't see much as it was
    dark.

26  RT 1151.

27  [17]  Inspector Levin testified as follows:  "At another interview at the hospital I asked her whether
    the lights would have been—she said the lights were before she blacked out, and I said could they
28  have been after you blacked out, and she said they could have been.  I further questioned her
    whether she heard a car door open, and she said no."  RT 780.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW
20

United States District Court
For the Northern District of California

1

> Diggs' conviction on attempted murder of Williams could have been reached one of two ways:  (1) as an aider and abettor of the shooter; (2) or as a principal—he shot Williams.  Either theory of liability is supported by the record.  Diggs accompanied Fain as they led Williams down the dark deserted road.  One of the two of them shot Williams point blank in the back of the head and then twice more.  Diggs either knowingly pulled the trigger, or knowingly distracted Williams so Fain could shoot her.  Diggs was properly convicted of attempted murder.

*Brown* at 11.

Petitioner's arguments with respect to the sufficiency of evidence supporting his attempted murder conviction[18] are the same as those addressed above with respect to his conspiracy conviction,[19] with one additional contention.  Petitioner argues "given that that only one weapon was used, and that the jury unanimously found that Diggs did not personally use a firearm, nor did he personally inflict great bodily injury (RT 1470), it is apparent that Mr. Diggs was convicted of these offenses as aider and abettor."  *Id.*  Petitioner acknowledges, but dismisses, respondent's assertion that alternative verdicts are permitted in California courts.  Trav. Mem. at 13 ("The state contends . . . that under California jurisprudence, a jury's acquittal on one count cannot be used to impeach its verdict on another count.").

Assuming he could only have been convicted as an aider and abettor, petitioner repeats his argument that the evidence only established that petitioner was somewhere in the general vicinity of the shooting, some unknown time before the shooting.  Pet. Mem. at 19.  Petitioner concludes that his "mere presence at the crime scene (sometime before the crime) is insufficient to sustain a conviction absent some evidence that he know or shared the perpetrator's intent, and that he acted to encourage the offense."  *Id.* at 15.

Petitioner, however, neglects to consider the Ninth Circuit's opinion in *Santamaria v. Horsley*, 133 F.3d 1242 (9th Cir. 1998) (*en banc*), *amended*, 138 F.3d 1280 (9th Cir. 1998) (*en*

---

[18]   Petitioner's contentions with respect to insufficiency of evidence for his conviction on count three (assault) are identical with those related to count two (attempted murder).  This court's finding below, then, that California Court of Appeal was not objectively unreasonable in its decision that the evidence was constitutionally sufficient to support petitioner's conviction for attempted murder, also supports the same finding with respect to petitioner's sufficiency of evidence claim for assault.

[19]   "Here, as above, there is no evidence to sustain a conviction on Count[] Two," attempted murder.  Pet. Mem. at 18.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW

United States District Court

For the Northern District of California

1    *banc*).[20]  The court in *Santamaria* held that the jury's acquittal of defendant on weapons

2    enhancement "did not *necessarily* mean that the jury had therefore found [defendant] guilty of

3    murder only as an aider and abettor" and noted that "California allows a jury to convict a defendant

4    for murder without unanimous agreement as to whether he was guilty as an aider and abettor or as a

5    direct perpetrator."  133 F.3d at 1245-46 (emphasis in original).  Further, "California does not

6    require the individual jurors to choose a particular theory of murder beyond a reasonable doubt, so

7    long as each is convinced of guilt."  *Id.* at 1246 (quotation marks omitted).

8         As the Supreme Court has explicitly stated, "[a]n acquittal is not a finding of any fact.  An

9    acquittal can only be an acknowledgment that the government failed to prove an essential element of

10   the offense beyond a reasonable doubt."  *United States v. Watts*, 519 U.S. 148, 155 (1997) (*per*

11   *curiam*).  It does not offend the Double Jeopardy Clause for the government to pursue alternate

12   theories of culpability in a criminal case and have the jury convict under one and acquit under the

13   other.  *Williams*, 422 F.3d at 1010-11.  Given the structure of California criminal law, there is no

14   offense to the Constitution if California retries a defendant for a *crime* under a theory that a jury has

15   previously found untrue for the purposes of a *sentence enhancement factor*.  *Santamaria*, 133 F.3d at

16   1247-48.  There is no basis for the court to issue a writ on petitioner's claim that the jury's findings

17   that he did not personally use a firearm or inflict great bodily injury upon Williams are inconsistent

18   with his convictions for attempted murder and assault.

19   **C.    Petitioner's *Bruton* Claim**

20        Petitioner claims that

21        [t]here can be no doubt but that Diggs raised a valid *Bruton* objection.  The
          prosecution, and later counsel for Fain elicited statements that Fain made about
22        Diggs' actions which were inconsistent with the statements that Mr. Diggs gave to the
          police.  Yet, because Fain never testified, Mr. Diggs was completely precluded from
23        cross-examining her as to those statements.  This was a fundamental violation of
          Diggs' right to confrontation.

24   Pet. Mem. at 23.  Petitioner contends further that if this court believes that the California courts

25   failed to address the issue of the *Bruton* violation, the court should conduct an independent review of

26

27

28   _____

     [20]   Petitioner cites *Santamaria* on page 11 of his petition in support of a different argument.

this question.[21]

      To properly analyze petitioner's claim, this court must begin by determining whether admission of Fain's unredacted statement would have , absent any waiver by petitioner, violated petitioner's rights under *Bruton*.  As the Court of Appeal did not address this precise question, the "last reasoned opinion" is from the trial court.  The trial court, responding to petitioner's motion *in limine*, ruled that admitting Fain's statement's about petitioner's actions would violate *Bruton* because Fain's statements placed petitioner with Williams in the general vicinity of Williams shortly before the shooting.[22]

      The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him."  The federal confrontation right applies to the states through the Fourteenth Amendment.  *See Pointer v. Texas*, 380 U.S. 400, 403 (1965).  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It

---

[21] Petitioner also argues that "[t]he state court's failure to dispute that *Bruton* was violated, should require this Court to defer and find a violation."  Pet. Mem. at 23 n.8.  Petitioner is correct that "[n]either the state courts, nor the state in its Answer here have ever disputed that admission of Fain's Statement violates the rule of *Bruton*."  Trav. Mem. at 15-16.  However, petitioner's further conclusion does not follow, that the state court's failure to dispute there was *Bruton* error should be deemed a "concession of error, or that the state court's presumption of error is entitled to deference." *Id.* at 16 n.7.  Petitioner's contention that § 2254(d)(1) compels this result is incorrect; § 2254(d)(1) merely determines the standard of review under which this court considers the petitioner's conviction as a whole.  *See Williams*, 422 F.3d at 1010 (under AEDPA, court reviews state court result, not reasoning).  Furthermore, it appears that at times during state-court proceedings, "Bruton" may have been used as shorthand to refer to both *Bruton v. United States*, 391 U.S. 123 (1968), and *People v. Aranda*, 63 Cal. 2d 518 (1965), as both cases dealt with the admissibility of confessions of a co-defendant.  *See* RT 35-36.  Only a result unreasonable under *Bruton*, not *Aranda*, would entitle petitioner to habeas relief in this forum.

[22] When ruling on petitioner's motion *in limine* to redact all mention by Fain of petitioner's actions on the night of February 7, 1995, the trial court stated:

     As I understand these statements here, Ms. Fain admits to being with the victim and says that Mr. Diggs is present at some point. . . . Mr. Diggs admits to being with the victim and says that Ms. Fain is present at some point.  The fact that each places the defendant there with the victim is the part which I think violates *Bruton*, so that part is going to have to be redacted from the statements.  So the statements will remain that Ms. Fain agrees to being with the victim, going wherever she went, whatever she said.  Mr. Diggs's statement that he was with the victim under whatever circumstances.  But at this point you'll have to redact all reference in each one's statement as to the other defendant being there.  And I think that this can be done.  After reading the statements, it can be done very easily.

RT 36-37 (italics added).

United States District Court
For the Northern District of California

commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination).  The Confrontation Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined.  *Crawford*, 541 U.S. at 61; *see, e.g., United States v. Medjuck*, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses.); *Wood v. Alaska*, 957 F.2d 1544, 1549 (9th Cir. 1992) (the right to confrontation includes the right to cross examine adverse witnesses and to present relevant evidence).  Cross-examination includes the right to show the witness's possible bias or self interest in testifying.  *See Chipman v. Mercer*, 628 F.2d 528, 530 (9th Cir. 1980); *Skinner v. Cardwell*, 564 F.2d 1381, 1388-89 (9th Cir. 1977).

Confrontation Clause claims are subject to harmless error analysis.  *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004).  In this respect, a *Bruton* claim is not different from other Confrontation Clause claims.  *See United States v. Rashid*, 383 F.3d 769, 775-77 (8th Cir. 2004); *see also United States v. McClain*, 337 F.3d 219, 222 (2d Cir. 2004).  "Under *Bruton* and its progeny, the admission of a statement made by a non-testifying codefendant violates the Confrontation Clause when that statement facially, expressly, clearly, or powerfully implicates the defendant.  *United States v. Angwin*, 271 F.3d 786, 796 (9th Cir. 2001).

However, where the co-defendant's statement does not on its face incriminate the defendant, but rather will only incriminate the defendant if "linked" with other evidence introduced  at trial, and the statement is redacted to eliminate not only the defendant's name, but any reference to her existence, the Confrontation Clause is not violated by admission of the confession with a proper limiting instruction to the jury.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *see Mason v. Yarborough*, 447 F.3d 693, 695 (9th Cir. 2006) (finding no *Bruton* error where only the fact, and not the content, of the co-defendant's confession was admitted at trial, and the facts from which the jury could infer that the statement might have implicated petitioner came through other, properly admitted evidence).

1    Here, both petitioner and Fain denied any involvement in the crime at all; their statements

2    were proffered as alibis.  Neither statement was inculpating, other than that each defendant agreed

3    that he or she had accompanied Williams to the general vicinity of her shooting shortly before it

4    occurred, and, in the initially redacted portions of their statements, each indicated the other had also

5    accompanied Williams.

6    The Supreme Court has never extended the protections of *Bruton* as far as Diggs claims; that

7    the Court of Appeal affirmed his conviction is therefore not an unreasonable application of clearly-

8    established Supreme Court precedent.  Fain did not state that petitioner shot Williams or even imply

9    that he did.  Fain and petitioner both merely claimed that both had accompanied Williams part of the

10   way to the location of the shooting.  Their statements were only incriminating to the extent they

11   were inconsistent with each other, from which the jury could infer that at least one defendant was

12   lying.  Petitioner's situation is similar to the one at issue in *Angwin*, where the alibis of the co-

13   defendants were inconsistent.  *See* 271 F.3d at 793-94.  Petitioner is not entitled to habeas relief on

14   this claim.

15   **D.    Petitioner's Ineffective Assistance of Counsel Claim**

16   The right to effective assistance of counsel guaranteed by the Sixth Amendment to the

17   Constitution has been clearly established by the Supreme Court.  *See Strickland v. Washington*, 466

18   U.S. 668 (1984).  In judging a claim of ineffective assistance of counsel, a court must ask whether

19   counsel's conduct so undermined the adversarial process that the result of the trial cannot be relied

20   upon as just.  *Id.* at 686.  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

21   petitioner must establish two things.  First, he must establish that counsel's performance was

22   deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing

23   professional norms.  *Strickland*, 466 U.S. at 687-88.  Second, he must establish that he was

24   prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but

25   for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at

26   694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

27   *Id.*

28

United States District Court

For the Northern District of California

1       As the court has found that petitioner has no valid claim under *Bruton*, the court need not

2  reach petitioner's claim that "assuming that Diggs' trial waived the *Bruton* objection, this Court must

3  nonetheless vacate Diggs' convictions because failure to adequately object to this prejudicial

4  evidence deprived Diggs of his Sixth Amendment right to effective assistance of counsel." *See* Pet.

5  Mem. at 24.  As petitioner had no *Bruton* objection, *see Angwin*, 271 F.3d at 796-97, it was neither

6  deficient performance for petitioner's counsel to not make further objections under *Bruton*, nor

7  would such objections have had a reasonable probability of affecting the outcome.

8  **E.      Petitioner's Motion to Re-Open Claim**

9       Petitioner claims that the trial court deprived him of his Fourteenth Amendment right to due

10 process by denying his motion to re-open the proceedings to correct the testimony of Williams.  Pet.

11 Mem. at 30.

12      **1.      Whether Petitioner's Claim is Exhausted**

13      Petitioner must exhaust state remedies before this court may grant him habeas relief

14 (although it may deny his claims on the merits before exhaustion).  *See* 28 U.S.C. § 2254(b).  The

15 exhaustion requirement is satisfied when a petitioner presents the highest state court with a fair

16 opportunity to rule on the merits of the claim.  *Crotts v. Smith*, 73 F.3d 861, 865 (9th Cir. 1996).

17 This gives the state "the initial opportunity to pass upon and correct alleged violations of its

18 prisoners' federal rights."  *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citations and quotation

19 marks omitted).  To fairly present a federal claim, it is not sufficient to raise only the facts

20 supporting the claim.  *Id.* at 277.  Petitioner must also bring the constitutional claim inherent in those

21 facts to the attention of the state court.  *Id.*  Thus the petitioner must "describe the operative facts

22 and legal theory on which his claim is based" to exhaust his state remedies.  *Tampua v. Shimoda*,

23 796 F.2d 261, 269 (9th Cir. 1986).

24      While petitioner may have framed his appeal to the California Supreme Court in terms of

25 abuse of discretion on the part of the trial court, he did alert the court to his federal claim.  Petitioner

26 argued that the failure to re-open violated his "federal constitutional rights to confront the evidence

27 against him and to a fair trial."  Resp. Ex. G at 22.  He supported his due process theory by citing to

28 *Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality opinion).  Resp. Ex. G at 22.  In

**United States District Court**
For the Northern District of California

*Simmons*, the Supreme Court held that imposing the death sentence on basis of information which the defendant had no opportunity to deny or explain to the jury violated fundamental notions of due process. *Simmons*, 512 U.S. at 165. Though *Simmons* is not directly analogous to petitioner's case, if read broadly it supports his due process claim. Petitioner also supplemented his legal theory with the relevant facts regarding Williams' testimony. Resp. Ex. G at 19-20.

Where a petitioner has identified the factual predicate for his challenge, along with a reference to the U.S. Constitution and a federal case supporting his claim, he has exhausted his state remedies. *Caswell v. Calderon*, 363 F.3d 832, 838-39 (9th Cir. 2004). Diggs's petition for review filed with the California Supreme Court satisfied these requirements. *See* Resp. Ex. G at 19-22. Petitioner therefore fairly presented his due process claim to the California Supreme Court and met the exhaustion requirement. This court may consider petitioner's claim that the denial of his motion to reopen violated his Fourteenth Amendment rights.[23]

**2.      Whether the Trial Court Ruling Implicated Federal Constitutional Error**

The state violates a criminal defendant's right to due process of law when, although not soliciting false evidence, it allows false evidence to go uncorrected when it appears. *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005). In such a case, the court may grant habeas relief "if there is any reasonable likelihood" that the false evidence could have affected the jury's judgment. *United States v. Agurs*, 427 U.S. 97, 103 (1976).

In the instant case, the parties do not dispute that Williams's testimony was slightly misleading as to the circumstances of her confession to a burglary. Pet. Mem. at 30; Ans. Mem. at 18-20. Although the true state of affairs was discovered while the jury was still deliberating, the trial court denied petitioner's motion to re-open. *See* RT 1421. Petitioner asserts that Williams, as the prosecution's "star witness," gave the jury the misleading impression that she had been "a repentant woman who voluntarily came forward to confess her past crimes." Pet. Mem. at 32. He further claims that had the case been re-opened, the jury would have had a more accurate picture of Williams as "a person who only confessed when confronted with incriminating evidence." *Id.* Although it may be desirable for the jury to have a completely accurate view of a witness, such a

**United States District Court**
For the Northern District of California

---

[23]  Furthermore, this court may deny an unexhausted claim on the merits. 28 U.S.C. § 2254(b)(2).

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW

United States District Court

For the Northern District of California

1    view is not constitutionally mandated.  The trial court's failure to correct Williams' testimony only

2    constitutes reversible error if there is "any reasonable likelihood" that her false testimony could have

3    affected the jury's judgment.  *Agurs*, 427 U.S. at 103.

4          Although Williams' testimony may have been misleading, there is no reasonable likelihood

5    that her false testimony affected the jury's judgment.  As the California Court of Appeal and the

6    respondent noted, Williams was addicted to an illicit substance, *i.e.* crack cocaine, and did not

7    hesitate to engage in illegal behavior to support her habit.  *Brown* at 20.  During her testimony she

8    admitted to committing burglary and engaging in prostitution.  *Id.*  Williams further testified that she

9    had been smoking crack cocaine on the day she was shot, and that in the past she had sold food

10   stamps to buy crack cocaine.  RT 559.  With a propensity toward such activities established in the

11   record, Williams had already been impeached.  Any implication that she voluntarily confessed to a

12   prior illegal act could have given her only scant additional credibility with the jury.

13         Since there was no likelihood that any false impression of Williams as repentant affected the

14   jury's judgment, denial of his motion to reopen was not an unreasonable application of Supreme

15   Court precedent.[24]  Petitioner is not entitled to habeas relief on this claim.

## F.    Petitioner's Jury Misconduct Claim

17         The Sixth Amendment guarantees the criminally accused a fair trial by an impartial jury and

18   requires that the jury verdict be based on the evidence presented at trial.  *Turner v. Louisiana*, 379

19   U.S. 466, 472-73 (1965).  In reaching a verdict, the jury may not consider extrinsic evidence (that is,

20   evidence not presented at trial).  *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987).  Jury

21

22

_____

23   [24]  In his petition, Diggs seeks to analogize his situation to that in several Supreme Court and Ninth
     Circuit cases.  Pet. Mem. at 31-32.  However, each is distinguishable from the instant case.  In
24   *Simmons*, the due process violation occurred during the sentencing phase, after guilt had been
     established.  *Simmons*, 512 U.S. at 161-62.  If *Simmons* were construed broadly, federal courts
     would be obliged to remedy a situation in which a jury might have a misconception of evidence
25   presented at trial, no matter how slight or inconsequential.  Such an interpretation is not workable.
         In *Alcorta v. Texas*, 355 U.S. 28 (1957), *Miller v. Pate*, 386 U.S. 1 (1966), and *Brown v. Borg*,
26   951 F.2d 1011 (9th Cir. 1991), the conviction in each case was reversed because the prosecution
     knowingly omitted information or offered information which it knew to be false.  *Alcorta*, 355 U.S.
27   at 30; *Miller*, 386 U.S. at 6-7; *Borg*, 951 F.2d at 1015.  Petitioner has not alleged that the
     prosecution withheld the incident report intentionally, nor does this court find any evidence in the
28   record that would support such an assertion.  As a result, the California courts' denial of the request
     to re-open is not contrary to any federal law clearly established by the cited Supreme Court cases.

United States District Court

For the Northern District of California

1  exposure to extrinsic evidence deprives the defendant of his rights to confrontation, cross-

2  examination, and assistance of counsel.  *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995).

3        However, jury consideration of extrinsic evidence does not necessarily constitute reversible

4  error.  A petitioner is entitled to habeas relief only if he can establish that the exposure to extrinsic

5  evidence had a "'substantial and injurious effect or influence in determining the jury's verdict.'"

6  *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting *Brecht v. Abrahamson*, 507 U.S.

7  619, 623 (1993)).  In other words, the error must result in "actual prejudice." *Brecht*, 507 U.S. at

8  637.

9        To determine whether the exposure was actually prejudicial, the court considers five factors:

10       (1) whether the extrinsic material was actually received, and if so, how; (2) the
         length of time it was available to the jury; (3) the extent to which the jury discussed
11       and considered it; (4) whether the material was introduced before a verdict was
         reached, and if so, at what point in the deliberations was it introduced; and (5) any
12       other matters which may bear on the issue of whether the introduction of extrinsic
         material substantially and injuriously.

13
    *Lawson*, 60 F.3d at 612 (brackets and ellipses omitted).  Although all factors are relevant and
14
    instructive, none should be considered dispositive.  *See Dickson v. Sullivan*, 849 F.2d 403, 405 (9th
15
    Cir. 1988).
16
          1.       **MUNI Schedule**
17
          In this case, two jurors stated that the jury considered a MUNI bus schedule that was not
18
    presented as evidence at trial.  CT 451-54, 579-80.  Three other jurors recalled seeing the schedule
19
    in the room during deliberations.  CT 574-78.  Although another three jurors stated that they did not
20
    see a bus schedule at any point during deliberations, it is not necessary that the entire jury was
21
    exposed to, or even aware of the extrinsic evidence to constitute reversible error; a criminal
22
    defendant is entitled to be tried by a panel of twelve "impartial and unprejudiced jurors." *Parker v.
23
    Gladden*, 385 U.S. 363, 366 (1966).  Even if only one juror is unduly biased or prejudiced, the
24
    defendant is denied his constitutional right to an impartial jury. *Tinsley v. Borg*, 895 F.2d 520, 523-
25
    24 (9th Cir. 1990).
26
          Based on the jurors' statements, there is little question but that a bus schedule was "actually
27
    received" by the jury.  *See* CT 451-53, 571-80.  Although there are varying accounts of who
28
    produced the schedule (Juror Bowman claimed it was a female juror; Jurors Owens and Pemberton

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW
29

United States District Court

For the Northern District of California

1   claimed it was an older male juror), it appears that the schedule was in the jury room by coincidence.

2   CT 574, 577-80.  The juror who produced it "just happened to have it;" the schedule was not

3   purposefully produced to answer lingering questions.  CT 574, 579-80.

4         It is not clear from the record how long the jury had the information at its disposal.  Jurors

5   Pemberton and Owens agree that it was open "just long enough to find the bus line and then the

6   frequency of buses at that time, certainly less than five minutes."  CT 577-80.  However, Juror

7   Elwood stated that the jurors used this information to create a time line of the evening in question,

8   which they then relied on throughout deliberations.  CT 451-52.  This is consistent with Bowman

9   and Pemberton's statements that the schedule was used to determine the timing of the buses.  As

10  petitioner notes, if the jury did incorporate the information in the schedule into their time line, the

11  extrinsic evidence may have been available to them for the rest of their deliberations.  Trav. Mem. at

12  38.  This scenario could also explain why three jurors do not recall seeing a bus schedule; if the

13  information was quickly incorporated into the jury's time line, some jurors might not have seen it or

14  been aware that the time line reflected evidence not presented at trial.  However, Elwood's statement

15  conflicts with that of Juror Hayes, who stated that "the schedule was not . . . copied.  Information

16  from it was not written on the blackboard."  CT 575.  So it is not clear if the information in the

17  schedule was reflected in the jury's time line, or exactly how long the information in the schedule

18  was available to the jury.

19        While the record does not show conclusively how long the information was available to the

20  jury, the weight of the evidence indicates that jury did not give it much discussion or consideration.

21  None of the jurors indicates that there was anything more than a short discussion of the schedule,

22  and some jurors had no recollection of a bus schedule being used at all.  But some evidence does

23  suggest that the jury used the schedule to make factual determinations about events between 7:30

24  p.m. and 8:35 p.m. on the night of the shooting.  CT 451-52.  If that was the case, the jury's

25  consideration of the extrinsic evidence may have been significant.  However, this evidence is

26  contradicted by the statements of Pemberton, Bowman, Hayes, and Owens, who all agreed that the

27

28

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW

United States District Court

For the Northern District of California

1   schedule was trivial and "did not play an important role during deliberations."[25]  CT 575.  Pemberton

2   went so far as to state that it "had no relevance whatsoever to the issues [the jury was] discussing."

3   CT 578.  Only Elwood's statement indicates significant consideration of information in the bus

4   schedule.  Weighed against the statements of the other jurors, this does not establish that the jury

5   considered the bus schedule extensively.

6   　　　Although the bus schedule was introduced before a verdict was reached, statements from the

7   jurors do not show that its introduction was a determinative factor in reaching the verdict.  The jury

8   made a time line of the evening of the shooting, which may or may not have taken the bus schedule

9   into account.  CT 451-52.  Elwood claimed that the bus schedule was introduced on the second day

10  of deliberations.  *Id.*  Even if the jury's time line included information from the schedule, the jury

11  took at least another day to reach a verdict.

12  　　　The course of jury deliberations in this case are in sharp contrast to the deliberations in

13  *Sassounian*, where the court granted habeas relief.  *See Sassounian*, 230 F.3d at 1100.  In that case,

14  extrinsic evidence was introduced on the fifteenth day of deliberations.  *Id.*  One hour later the jury

15  returned with a verdict.  *Id.*  The court held that "lengthy deliberations preceding the misconduct and

16  a relatively quick verdict following the misconduct strongly suggest prejudice."  *Id.*  Here, the

17  opposite occurred; the misconduct was followed by lengthy deliberation.  This does not suggest

18  prejudice.  Furthermore, the lengthy deliberations after the introduction of extrinsic evidence

19  confirms the statements of Pemberton, Bowman, Hayes, and Owens that the schedule did not play a

20  significant role in the deliberations.

21  　　　Finally, the court must consider any other matters that may bear on the issue of whether the

22  extrinsic evidence actually prejudiced the jury, including the nature of the evidence against the

23  petitioner and whether the extrinsic evidence pertains to a material issue in the case.  *Lawson*, 60

24  F.3d at 612.  The evidence against petitioner was heavily circumstantial.  No physical evidence tied

25  _____

26  [25]  Petitioner objects to excerpts from several of the jurors' statements because they relate to "how
    this evidence effected [sic] or did not effect [sic] the deliberations."  Trav. Mem. at 34.  It is true that

27  a "reviewing court must not consider evidence concerning the subjective impact of extrinsic
    evidence on the deliberation process, but must instead focus on an objective inquiry into the

28  potential for prejudice."  *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir. 1988).  However, the
    statements here do not concern the MUNI schedule's subjective impact on the jurors.  The
    statements objectively show what the jury discussed, and for how long, during deliberations.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW

either Fain or petitioner to the attempted murder; the police found no gunpowder residue or blood on their hands and clothes, and never recovered the weapon. *Id.* In addition, Williams was unable to identify the person who shot her or state precisely when she was shot. *Id.* Although such circumstantial evidence is sufficient for conviction, *Stauffer*, 922 F.2d at 514, it may be an indication of actual prejudice where there is jury misconduct.

On the other hand, timing was not a material issue in the case. Petitioner and Fain admitted that they got on the bus with Williams. RT 725-26, 758-59. Fain, Williams, and petitioner all agreed to getting off at the same stop. *Brown* at 25. The issues at trial "did not center upon when they got on the bus or how long the bus ride took, but rather, who were the perpetrators. The bus schedule did not answer that question." *Id.* This factor indicates a lack of prejudice.

Another consideration falling under the fifth *Lawson* factor is the trial court's characterization of the incident. *United States v. Plunk*, 153 F.3d 1011, 1024 (9th Cir. 1998). According to *Plunk*, the trial judge's impression of the impact of the extrinsic evidence must be given "special deference" since "the trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature." *Id.* Here, the trial judge did not "find that . . . this material would have inherently influenced this particular jury," or any likelihood that "this jury was impermissib[ly] prejudiced." RT 1503. The trial judge's opinion of the effect of the extrinsic evidence on the jury does not support petitioner's claim of actual prejudice, and this factor is given extra weight because the trial judge's impression receives "special deference."

Collectively, the *Lawson* factors do not establish that the jury's consideration of the MUNI schedule had a "substantial and injurious effect or influence in determining the jury's verdict." Accordingly, this court does not find that the Court of Appeal's decision regarding the introduction of extrinsic evidence into jury deliberations was an unreasonably application of federal law.

**2.     Juror's Statement Regarding Use of Crack Cocaine**

According to Juror Elwood's declaration, "someone also made reference to the fact that if you do crack cocaine, it does not mean you lose your memory." CT 451-52. Petitioner claims that the juror who made the statement "injected extrinsic evidence into the jury room that bolstered the

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW

United States District Court
For the Northern District of California

1   prosecution witness' testimony and undermined the defense experts and theory of the case." Trav.

2   Mem. at 38.

3        Petitioner's argument is not persuasive because the unknown juror's statement is not expert

4   opinion and therefore not extrinsic evidence barred from consideration by jurors.  The statement

5   arguably made reference to the expert testimony regarding the effects of cocaine on memory that

6   petitioner elicited at trial.  There is no evidence that the juror was asserting his subjective knowledge

7   of the effects of cocaine, or anything more than his own reaction to the testimony at trial.  If the

8   comment was a reaction to the testimony, "jurors are entitled to form opinions about the witnesses

9   and parties before them." *Grotemeyer v. Hickman*, 393 F.3d 871, 878 (9th Cir. 2004).  Jurors are

10  also entitled to make fair comment on the evidence.  *United States v. Navarro-Garcia*, 926 F.2d 818,

11  821-22 (9th Cir. 1991); *see also* CAL. PENAL CODE § 1127(b).  Thus, the unidentified juror was

12  entitled both to form an opinion of the expert's testimony and to share it with the rest of the jury

13  during deliberations.

14       Even if the juror's statement was based on his experiences outside of the trial and

15  deliberations, it does not amount to misconduct.  The mere fact that the juror relied on his outside

16  experience in forming an opinion is not sufficient to make his alleged statements violate petitioner's

17  constitutional right to confrontation.  *Hickman*, 393 F.3d at 878.  The Ninth Circuit has stated that

18  "[i]t is expected that jurors will bring their life experiences to bear on the facts of a case." *Hard v.*

19  *Burlington N. R.R. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989) (denying new trial where one juror used

20  personal knowledge of x-ray interpretation to sway others, reasoning that jurors are supposed to

21  bring life experiences into jury room).

22       A juror's past personal experience is an appropriate part of the deliberation, because "one

23  great advantage of jurors over judges is their diversity of experiences." *Hickman*, 393 F.3d at 879

24  (holding that foreperson's comments based on her experience as medical doctor that defendant's

25  mental disorders caused him to commit crime and that he would receive treatment as part of

26  sentence did not introduce extrinsic evidence).  If the juror was basing his statement on outside

27  experience, rather than commenting on the expert testimony, there was still no reversible error in his

28  comment to the rest of the jury.  Therefore, the California Court of Appeal's rejection of petitioner's

1   claim for relief on this issue was not an unreasonable application of clearly-established federal law,

2   and petitioner is not entitled to habeas relief on this claim.

3       **3.    Petitioner's Letter**

4       In a letter dated May 12, 2004, counsel for petitioner urged that petitioner's jury misconduct

5   claim should be reviewed by this court in light of a recent Ninth Circuit decision.  Counsel argued

6   that given the decision in *Caliendo v. Warden of California Men's Colony*, 365 F.3d 691 (9th Cir.

7   2004), this court should impose a "heavy burden" on respondents to overcome a "strong presumption

8   of prejudice" with respect to petitioner's jury misconduct claim.

9       In *Caliendo*, however, the court was quite clear that the presumption of prejudice was

10  appropriate because the case concerned an extra-judicial communication between a witness and

11  several jurors.  Accordingly, the analysis in *Caliendo* is applicable to cases concerning extra-judicial

12  communications with jurors, not to all cases of juror misconduct.  *See Caliendo*, 365 F.3d at 695

13  ("Any unauthorized communication between a juror and a witness or interested party is

14  presumptively prejudicial, but the government may overcome the presumption by making a strong

15  contrary showing.").[26]

16  **G.    Evidentiary Hearing**

17      Having found no violation of petitioner's confrontation and due process rights, there is no

18  need, as petitioner has urged, for an evidentiary hearing.  *See* Pet. Mem. at 40.  Petitioner does not

19  have a claim based on "a new rule of constitutional law, made retroactive to cases on collateral

20  review by the Supreme Court, that was previously unavailable" or "a factual predicate that could not

21  have been previously discovered through the exercise of due diligence."  *See* § 2254(e)(2)(A).

22

23

24

---

25  [26] In the same letter petitioner's counsel further asserted that respondent should bear the burden of proving beyond a reasonable doubt that petitioner's constitutional rights have not been violated, citing several cases in the Ninth Circuit which have imposed such a requirement pursuant to

26  *Chapman v. California*, 386 U.S. 18 (1967).  The cases included *Dyas v. Poole*, 317 F.3d 934 (9th Cir. 2002); *Fernandez v. Roe*, 286 F.3d 1073 (9th Cir. 2002); and *Shumway v. Payne*, 223 F.3d 982

27  (9th Cir. 2000).  While petitioner's counsel has correctly noted that *Chapman* imposes such a burden on the government, this standard applies to state appellate courts.  *Shumway*, 223 F.3d at 986.  In

28  contrast, federal courts conducting habeas reviews are subject to the harmless error standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-39 n.9.

United States District Court
For the Northern District of California

**III.  ORDER**

For the forgoing reasons, the court denies the petition for a writ of habeas corpus.


DATED:          9/14/06          

*Ronald M Whyte*
RONALD M. WHYTE
United States District Judge

**THIS SHALL CERTIFY THAT A COPY OF THIS ORDER WAS PROVIDED TO:**

**Counsel for Petitioner:**

Marc Zilversmit
523 Octavia St.
San Francisco, CA 94102

Nina Wilder
Weinberg & Wilder
523 Octavia St.
San Francisco, CA 94102

**Counsel for Respondents:**

Gregory A. Ott
California State Attorney General's Office
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

Counsel are responsible for distributing copies of this order to co-counsel, as necessary.

Date: _____        _____

                                          Chambers of Judge Whyte

United States District Court
For the Northern District of California

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS—No. C-99-20659 RMW